ARMIN VANN, Plaintiff, *v.* ROSE IONTA, Doing Business as ROSE'S BEAUTY PARLOR, Defendant.

Municipal Court of New York, Borough of Queens, Fourth District, Part 1, December 5, 1935.

*Martin Schwaeber* [*Harry J. Beckwitt* of counsel], for the plaintiff.

*Conroy & Hein* [*Philip H. Waters* of counsel], for the defendant.

PETTE, J.   Plaintiff sues the owner of a combined barber shop and beauty parlor at Neponsit, Rockaway, on the theory of *respondeat superior*, for injuries sustained when his left hand was cut while he was being shaved by a barber employee of the defendant. It is alleged that Jimmie, the employee, was negligent in the use of the razor as follows: Plaintiff, who is a business man in the neighborhood, sat in Jimmie's chair to be shaved.   He testified that Jimmie had shaved him twice before without trouble, but that this

time Jimmie " started to fool around " and began " wise cracking and tickling " him.   Plaintiff claims that he told Jimmie to stop, that he was very ticklish, but Jimmie persisted.   He says that Jimmie made wise cracks and " poked him in the ribs " at the same time, causing plaintiff, as he says, to be in a " continuous state of laughter, uncontrolled."   About the time plaintiff had been shaved over once, he claims that Jimmie again tickled him and that this time, he, plaintiff, jumped up, his hand caught the razor and a severe cut resulted, requiring fourteen surgical sutures.

Jimmie testified that he has been a barber for ten years and had been working for defendant about two years.   He admits talking to the customer, but denies that he poked or tickled him.   When plaintiff came in this time, they got to talking " about things " and the customer started laughing.   Jimmie says that he does not recall the subject of conversation, but that he went right on with his task and got through shaving once over; but that as he was about to wipe the razor on the tissue paper which was resting upon the customer's chest, the razor " must have tickled him," so that plaintiff jumped up and grabbed the razor.

The question is one of negligence on two theories: (1) In the operation or handling of the razor by the employee, and (2) in employing a helper with " an unusual propensity for fooling around with customers."

With respect to the first ground of negligence, I am inclined to find for defendant for the reason that the facts seem to support the view that this was an unavoidable accident, as to which there can be no recovery.   I do not believe that this barber of ten years' experience, with razor in hand, intentionally poked and tickled the plaintiff with the other hand.   My observation of the witnesses rather impresses me that owing to plaintiff's easily excitable ticklishness, when the back of the razor struck his stomach or chest, he instinctively caught hold of the razor, thereby unfortunately sustaining the injuries.

The second theory of negligence requires a determination of what constitutes an " unusual propensity " on the part of a barber " for fooling around with customers."   This very theory presupposes that barbers *usually* have a tendency to " fool around with customers."

In order to ascertain what conduct is to be classified as unusual on the part of a barber, we are first to see what is usual.   There is no testimony either way, and the court is called upon to fix the usual rule of conduct substantially by resorting to judicial notice. There being no reported precedent, we are free to inquire into what is the common practice, as one of first impression.   Considerable

significance is to be attached to the fact that no similar case appears to have reached the courts heretofore, that is, at least the higher courts, so that there might be a record thereof. The presiding judge may have personal knowledge of the adaptability of some barbers to jest and humor so as to entertain their patrons, but that would not permit the taking of judicial notice. The custom must be so widespread that it can be said that the tribunals will take cognizance thereof without special proof, and accept it as an established fact. What then, is a barber's habit of " fooling around " with customers? The answer may have equal application to ladies' beauty parlors, which are closely related to the barber shop in primary and ultimate purpose. A passage in Jimmie's testimony is a guide to an examination of the subject. He was asked by the court whether he was not " usurping the functions of a comedian," that is, whether he was " pulling an Eddie Cantor " on plaintiff, by " wise cracking," to which he, wistfully enough, replied: " Well, when a customer comes in he doesn't like to sit in the chair and be still, he wants you to talk to him."

So that, while admitting the talking, Jimmie tenders the proposition that barbering and talking go hand in hand, and that although the conversation evokes laughter, there can be no negligence based on that fact alone. Let us, therefore, see whether talking, and what quality and quantity, are really integral with tonsorial manipulations. My reading of reference books upon the barber's antecedents reveals him as a gentleman extraordinary, a factotum of no mean attainments and a useful adjunct to civilization itself.

The barber's art is rooted in antiquity, and its field is rich in fascinating lore and history revolving about the art's versatility since early days and its reduction from a profession to a calling of more humble character. In biblical times he was shaving both the face and beard, presumably because there were no cosmetics or hair tonics in those days. The prophet Ezekiel, V, 1, commanded, apparently in keeping with the times: " And thou, son of man, take thee a sharp knife, take thee a barber's razor, and cause it to pass upon thine head and upon thy beard." (Holy Bible, King James Version, Oxford ed.) Of course, the departure in modern times from the command to shave the head is indicative of a wisdom that has grown with the years.

The barber appears to have been introduced in Rome about the year 454 of that city, antedating the Christian era. It was about that time that the barber first began to earn his reputation for versatility that was to attach to his calling down through the years. Indeed, he appears to have been the first medium for the dissemination of news of public or private interest. Historically, therefore, he

is viewed as the original " newspaper," besides his other activities presently to be observed. Barbers are alluded to by Horace as most accurately informed in all the minute history, both of families and of the state. The Encyclopedia Americana records that in Rome " as elsewhere, when once introduced, they became men of great notoriety, and their shops were the resort of all the loungers and newsmongers in the city."

An Italian lexicon published in 1865 advises that the index of publicity was whether a subject had been discussed in a barber shop. If it had, it was public enough, that it had then reached the dignity of public property. Indeed, the authors give what then appeared to be the classical definition of a barber as: " the twin brother of the surgeon, the cousin of the physician, the vicar of the confessor and the substitute for the secretary," adding that whosoever desired to hear any news, all he had to do was to go to a barber shop. The book does not tell us if any fee or honorarium was exacted for the service, but it seems that the events were narrated merely as an incident to the profession, the barber acting as the gatherer of information coming to him from patrons of all sorts.

That the news gathering branch of the art was only a small part of the promiscuous duties imposed upon the barber by the community, and that the nature of his services may have aided the artist, with the passing of time, to become a loquacious and jesting fellow, is manifest upon further inquiry. Then Encyclopedia Americana states that in bygone days the barber was also an elementary physician and surgeon. " The art of surgery and the art of shaving went hand in hand," that the barbers dressed wounds, did blood-letting and other surgical operations. The title of " barber-surgeons " was generally applied to them and they were even incorporated as such by King Edward IV in 1461, being at the time the only persons who practiced surgery. The present barber's pole had its origin in those days, when the spiral bands or " fillets " around the pole were intended to indicate the bandage twisted around the arms previous to letting out blood. The basin which formerly hung from the pole designated the receptable to receive blood, which (we learn otherwise) was drawn by making incisions or by applying leeches to the affected parts.

The New International Encyclopedia sustains the foregoing information, adding that the blood-letting barber-surgeon was honored as a professional man, and Chambers' Encyclopedia recites that the barber was also celebrated for his garrulity and general obliging qualities, such being required by those who place themselves in his hands. The barber shops of Athens and Rome were

great meeting places for idlers and gossipers, and in provincial towns they continue to serve such purposes up to the present time. The Encyclopedia Britannica supplements that " in addition to its attraction as a focus of news, a lute, viol, or some such musical instrument was always kept for the entertainment of waiting customers." We know that to be a fact in our own rural communities, and the custom would seem to be a salutary one because the music no doubt serves to relieve the nervous tension of the intrepid patron or " patient " about to assume the attitude of the " customer in the chair " by placing himself in the physical control of the artist.

Common observation furnishes proof that the barber is truly a philosophic person, of amiable and a tractable disposition, ready to be accommodating, and always dispensing vocal wares with varying degrees of humor and intelligence, while the razor follows the facial contours and, maybe, the course of least resistance, depending upon when it was last sharpened. That barbers talk cannot be disputed. Some talk more, some less, some humorously, some not, but talk they do. It is traditional and hereditary with them. The subjects are varied and the train of thought develops in endless chain, tempered only by the customer's assertion of his right to be free from enforced restraint as soon as the operations are over. The artist's sources of information are manifold, and with the next customer he puts to use what he has learned from the last one, thereby keeping in circulation all sorts of topics, although he may have a personal inclination for literature, art, music or the sciences; and it naturally follows that he becomes well versed in the affairs of the world, past, present and the speculative future. From his ranks there have risen men who have infiltrated themselves in our social structure with commendable success. I sometimes suspect that great oratorical silver tongues of history may have begun their undying orating upon the willing or unwilling ears of the customer in the chair.

That the barber's qualifications are more or less generally understood as above stated appears to be reflected by that jovial character Figaro in Beaumarchais, comedy " The Barber of Seville," immortalized by Rossini. The opera is one of the wittiest of all dramas and the central hero, Figaro, the barber, is described as " a marvelous half autobiographic combination of gaiety and philosophy, disillusioned shrewdness, deep reflection and lambent wit. * * * The dialogue throughout sparkles with overflowing wit, unexpected turns of phrase, words of double intent, topsy-turvy application of proverbial wisdom and even quite superfluous jests." (Encyclopedia Americana.) Figaro's many occupations conjoined as

they are with the principal one of shaving, appear to be typical of the barber's versatility of the times (1775), and of the requirements of the public. That the barber's activities were multifarious indeed in medieval days and even in comparatively modern times is to be seen by a study of that famous character: 1. He gaily proclaims that he was the factotum of the whole city, and that as such, everybody should make way for him to pass. 2. He announces that no profession compares with that of such a barber as he, for besides his services with scissors and razor, he is confidential adviser to all sorts of people, cavaliers and ladies alike. 3. He reveals himself as a perambulating matrimonial agency, by boasting that without him not a girl in Seville could find a husband. To him, he says, comes the little widow who would like to be married again, and it is all so easy, for what with his comb and razor by day and his guitar at night, he is admitted everywhere. 4. Why, in the very house where Rosina, the old doctor's ward, lives is not he, Figaro, barber, coiffeur, surgeon, herbalist, druggist, vet, and confidential man, in general? 5. He administers a purgative to a lawyer ill of indigestion. 6. He prepares wigs for ladies. 7. He shaves and cuts the hair of the officers of a whole regiment. 8. Acts as the go-between to the loving count and the gracious Rosina, and, by his original stratagems, arranges for their meeting and marriage against the imprecations of her guardian, the old doctor, who himself was conspiring to marry the girl and her money. That Figaro acquits himself nobly in all his missions demonstrates that the present barber's predecessor was a genial and astute fellow with courageous directness, witty lies, proverbial shrewdness and a somewhat charmed life.

Our own knowledge of the contemporary barber shows that he has lost none of the finesse of his ancestral prototype down through the ages. Indeed, he cannot escape from following in the footsteps of those that have gone before, for the very reason that his clients of yesteryear are the same today. There, in the barber's chair, the statesman, the executive, the professor, the tradesman, the peasant, the candlestick maker, the husband and the lover alike, each in turn trends his way to receive the benefits that nimble fingers may administer to his facial contours. That at the same time the artist pours upon his ears friendly words of general interest, humor or a philosophical discourse, is but an attribute incidental to the manipulations themselves. It goes without saying that fingering one all over the face is a strictly personal and privileged transaction. Therefore, being a student of human nature by force of his profession, the barber deals strictly with the customer in the chair, the individual whose fastidious or peculiar traits he must minister to. His sources of information being varied and

recurrent, he becomes a storehouse of human knowledge, and dispenses it by applying his strategy and his inborn philosophy to meet the exigencies of the occasion. One cannot imagine a silent barber. Nor does he use his silver tongue without cause. While often-times prompted by the customers themselves, whose talkative disposition varies, it would seem that nature has predisposed the barber to overcome the difficulty of making a customer feel at ease, by so mixing the elements in him that his vocal chords and his mannerisms might be employed, softly but surely, to assuage the customer's inherent fears, and lull him into a sense of confidence that deprives his constricted situation of any of the terrors of the dentist's chair, or the awe which the witness chair inspires. Nor is the position of such a customer akin to that of the witness in the chair to whom a recent editorial referred as " the most miserable of all creatures," what with being the complacent friend of the side he espouses, the subjective instrument of the court's majesty, the football of the cross-examining attorney, the focus of the jury's inquisitorial powers and the object of plaintiff's or defendant's fervent prayers.

Happily, to the customer in the barber's chair, such ordeals are spared. In that chair all traces of the man's condition in life are temporarily subjugated to the barber's physical control to which the customer readily submits unscathed by the experience, for the purpose of facial embellishment, common to all mankind. So situated, the customer in the chair furnishes a vivid example of the truth of the great Lincoln's motto that " all men are created equal." It being his innate design to render his patient impervious to the risk attendant upon the use of the razor, the barber approaches the man before him tenderly but warily, and by the use of his faculties at once renders the personal encounter a friendly one, whether by propounding a question or by making a statement. A polite " good morning " from either side is enough incentive to start the ball rolling. From then on, with the customer's limited locomotion, there may ensue a conversation which according to the given position of the razor, may assume the qualities of a suppressed duet in various forms, for the barber's chair is not a place where one may repose, in the words of Bryant, " like one who wraps the drapery of his couch about him and lies down to pleasant dreams." Courageous indeed is the man who ventures forth in a reclining position in the barber's chair, for well may he recall, before he engages in conversation, the words of Dante upon entering Inferno, " Abandon all hope all ye who enter here," since we all know that the razor has a facile way of cutting flesh more so than the beard. And while the customer may appear to

be resting, whether his eyes ·be open or shut, yet must he be on the *qui vive*, although in docible mien, to answer the artist, if need be, by word of mouth, by grimace, by grunt. or by wiggling his toe, whichever· he is permitted to do at the moment, having regard to the proximity of that ominous instrument to the throat and with an eye upon the barber's countenance, to see if he is still friendly.

And if you do not answer, you may *ipso facto* be treated as a cranky customer, which may so reflect upon the smooth cutting qualities of the razor as to produce a shave half pulled and half scraped, so that the face may smart for days. If you speak at an inopportune moment, you may flirt with injury, or at least with a mouthful of soap that will be far from appetizing. If you seek a compromise by winking, maybe intending thereby to tell the barber to shut up, the wink may have the opposite effect, for the barber may think that the customer is encouraging him in his discourse. If you move a foot, you may break a mirror and thus incur the proverbial seven years' hard luck, and if you shift your position the barber reprimands you, humorously but firmly, because he loses his equipoise or the razor may refuse to cut at all, if the hand that guides it is not attuned to the barber's thoughts, which find articulation through his silver tongue.

Grave problems may be pervading the customer's mind and he may be meditating upon his next step the moment he is released from restraint, again to breathe in the free air, but those things do not coincide with the barber's thoughts, for he is a high-class salesman, not by forceful or high pressure methods, but by more subtle, persuasive process, which develops as the soapy nebula begins to accumulate around and about the facial orifices. It is then that the artist begins to approach the subject nearest to his heart and furthest from the average customer's mind, by trying to induce the customer to have his map or pate smeared with one or more of the dozens of familiar lotions of dubious value which daily seem to change in color and aroma, though not in substance or price, nor even in efficacy, as many of us perceive by a look in retrospective contemplation, at the remains of a once luxuriant shock, that has either thinned and grayed or disappeared altogether. Bearing upon the development of the art from remote days, I learn from the December issue of the Reader's Digest that in a barber shop in Rockefeller Center there is on display a collection of pictures showing various types and combinations of beards and moustaches in all ages and places, and ancient razors and tools, which may almost be regarded as a mirror of the progress of civilization itself.

In the light of the foregoing views I hold to the opinion that the barber's business is fraught with a degree of inevitable risk,

obvious and known to both the artist and the customer, and to which the patron is voluntarily exposed, as a necessary incident of the manipulations which must be performed to produce the ultimate result. The barber is traditionally a man's friend, and though adventurous within the sphere of his field, he may and usually is trusted to do his job with the least possible harm. More than that, from time immemorial he has accomplished his duty with dignity, tempered with humor and good fellowship. That is far from negligence. That injury sometimes results must be attributed, as here, to a fortuitous occurrence rather than to fault. Prompted by the recognized fact that we do not know a good thing until we have to do without it, I venture to say that if the barber's courtesy, jocular ways and pleasant disposition were suddenly to stop, there would be considerable hesitation to sit in his chair, which would not be unlike the sensation one must experience in facing the fatuous " life's darkest moment." The world need have no qualms about the barber's mission on earth, for he and his traits, recognized since biblical times, have successfully withstood the ravages of the centuries and for aught that appears will outlive many people and many customs in the far flung corners of the world before his craft shall perish, if ever.

Basing my finding upon the barber's historical background, I am unable to discern any " unusual propensity for fooling around with customers," on the part of the defendant's employee. He appears to have proceeded about his work by talking while shaving, in a manner quite in keeping with the usages of the art in vogue since the dark days of ages past.

Plaintiff at most shows a pure accident. No extra precautions appear to be likely to have prevented it. The barber was engaged in the performance of a lawful act by lawful means. There is no evidence, nor in the nature of things was it probable, that by the exercise of the utmost degree of care, Jimmie could have foreseen that plaintiff would impulsively grab hold of the razor. Plaintiff certainly had knowledge of the peril he incurred in the attitude of a customer being shaved. A different situation might arise if plaintiff's hand had been resting about his breast or stomach and had been cut by the razor that would ordinarily have no business in that region of the patron's anatomy. In the aspect of the facts most favorable to plaintiff, therefore, he comes clearly within the rule that no recovery may be had where the accident occurs under circumstances indicating that it was unavoidable, even though due to want of prevision that one would act in a certain manner upon a given stimulus or occurrence. The *causa causans* was not negligence on Jimmie's part, but plaintiff's act in grasping the razor,

which act Jimmie is not shown to have had reasonable cause to anticipate even by the exercise of ordinary prudence. (*Garrett* v. *City of Schenectady*, 268 N. Y. 219.)

Of course, the result here reached does not give Jimmie or his kindred artists a free rein in the discharge of their duties. They will undoubtedly be held to strict accountability in law if an accident is due to their negligence, whether it be founded upon a state of extreme or unreasonable garrulity or gesticulation, or both, or otherwise. This particular accident was regrettable enough, and in the nature of things a similar misfortune will not happen again in many a moon.

Therefore, since liability must be measured only in terms of law, I direct judgment for defendant on the merits.